1, as that arose before a special court, acting under a special commission, for special purposes. Nor can there be a just reason to object to the trial's coming on, because of the place at which the court is held. On the motion for a special court, sufficient was disclosed to shew, that the indictments would be presented in Philadelphia; and it was a mere speculation afterwards to suppose that another place would be appointed for the trials; particularly as all the jurors and witnesses had been actually summoned.

BY THE COURT. The only argument of weight in support of the present motion, is that which relates to the period of furnishing the prisoners with the names of the witnesses; but it is, of itself, conclusive: for, unless an opportunity were afterwards given to investigate the characters, and trace the conduct of the witnesses, it would be nugatory and delusive to furnish the list of their names. The act directs notice to be given; this must be intended for the purpose alluded to, and, for the attainment of that purpose, time is, undoubtedly, necessary. It must, therefore, be considered as a rule in this case, and in all other cases of a similar nature, that a reasonable time shall be allowed, after a list of the names of the witnesses is furnished to the prisoners, for the purpose of bringing testimony from the counties in which those witnesses live. The trials of Stewart & Wright were, accordingly, postponed; and it was then agreed that they should not be brought on 'till the trial of the other prisoners, who were ready for trial, was concluded; but so much time was consumed in this previous business, that the judges declared they could not longer protract the sitting of the court, on account of other circuits, and, therefore directed the cases of Stewart & Wright to be continued generally 'till the next term. It appeared, however, that on the preceding day, Lewis had informed the attorney for the district, that he would proceed to trial in the case of Stewart, with the testimony already in his possession, though he expected other witnesses; and, on this ground, as the court was about to break up, he moved, that Stewart should be admitted to bail.

But, BY THE COURT, it was Stewart's own fault, not the fault of the prosecutor, that the trial was postponed. He has now the same witnesses, that he had at the time of the postponement; but the judges cannot, consistently with their other duties, enter on the trial. It is true, that we have established it as a principle, that no laches should be imputed to the prisoner, for taking time to send into the counties where the witnesses for the prosecution reside, after he had received notice of their names; but that is not the case at present. Stewart has no claim upon the legal discretion of the court; and, indeed, the circumstances must be very strong, which will, at any time, induce us to admit a person to bail, who stands charged with high treason.

## Case No. 16,401a.

### UNITED STATES v. STEWART et al.

[2 Hayw. & H. 280.] [1]

Criminal Court, District of Columbia. Aug. 18, 1857.

CONSTITUTIONAL LAW—CALLING OUT MILITARY IN DISTRICT OF COLUMBIA—RIOT—ELECTIONS.

1. The 15th clause of the 8th article of the constitution of the United States, which confers upon congress the power to provide for the calling forth of the militia to execute the laws of the United States, and the act of congress of February 28, 1795 (1 Stat. 424), apply to the states.

2. The 2d section of article 2 of the constitution, which makes the president commander in chief of the army and navy of the United States; and section 3 of the same, which makes it his duty to take care that the laws be faithfully executed, empower him to call out the military in aid of the civil authorities of the District of Columbia.

3. Where the commissioners of election closed the polls contrary to the law, which required them to be open from 7 a. m. to 7 p. m., it was the duty of the mayor to demand that the polls be opened, but he had no power to enforce the demand.

4. Where parties, at least three in number, did in a violent and turbulent manner, to the terror of the people, with a determination to assist one another against any who should oppose them, act together according to previous concert and arrangement, for the purpose of thwarting the efforts of the mayor to have the polls open, and opposing his efforts to preserve the public peace, as many of them who thus acted would be guilty of a riot.

After the close of the testimony on the part of the United States and the prisoners [Dan Stewart and others], Mr. Key asked two instructions of the court to the jury, which he read to the court as follows: If the jury believe, from the evidence, that the mayor of Washington made an application to the president of the United States and the secretary of the navy to order out the United States marines to assist him in preserving the public peace, and the said marines were accordingly ordered by the secretary of the navy, and were marched by the direction of the mayor to the place of disturbance, to wit: to the first precinct of the Fourth ward, then the said mayor and the said marines were there legally. If the jury believe, from the evidence, that the commissioners of election of the said first precinct of the Fourth ward closed the polls of said precinct for no other reason than the one given, that is, the presence of the said marines in closing said polls was an illegal act, and the said mayor, by virtue of his office, and in execution thereof, possessed full power and authority to order the said polls to be opened, and all persons who in a violent and turbulent manner, acting together, either by previous concert or by concert springing up at the time, opposed

[1] [Reported by John A. Hayward, Esq., and George C. Hazleton, Esq.]

the efforts of the said mayor, either to have the said polls opened or to preserve the public peace, are guilty of a riot.

Mr. Scott said .that he could not admit such a point to be allowed. of the right of the secretary of the navy to call out the military under arms, and give the discretionate authority to the mayor to use them as he might think best. The president had no right to use the military force of the United States in a proper case, to quell or prevent a riot; he might use · the means which were provided by law, and such means only; he contended that the constructions of the court of the article in the constitution in relation to the execution of the laws had an important qualification. A justice of the peace had authority to make others keep the peace; sheriff's, constables, marshals are peace officers, all have the like authority; a sheriff charged with the process of a court has authority to summon his posse to aid him; but all this authority pertains to all these officers only in certain cases; these means provided by the law are only to be resorted to when these means are necessary. If the marshal of this district receives authority to summons or execute upon citizens of this district, has he power to go into the streets to summons a posse to assist him to execute? With certainty does that authority belong to him only when resistance is made to such execution of the laws. Yet if the act of the president or secretary is beyond question; if the act of the mayor is beyond question; if the discretion of the parties is to be the law on that occasion, how long will it be before military rule fixes its iron grasp upon us? The laws of congress give a municipal charter to this district. It confers upon them legislative powers. It provides for stated elections; time and place is prescribed for the election, and to prepare the points or places of election, and of giving the votes. Has the president the right; or any subordinate member of the cabinet, of their own heads, or at the suggestion of the mayor, to march the military to these places and make the citizens vote through a file of marines? If they have the right at their will, there must be a call existing to justify the ordering out—there must be something to make the act necessary. Now, what circumstances can make such an act necessary, or excuse it? If the peace is disturbed, if riots occur, or affrays, the law imposes the duty on the civil authority of that community to suppress it, and imposes the means of discharging that duty. The mayor has his police, his auxiliary guards. He has power to increase this force by especial appointment. The law imposes the duty on them of suppressing, and providing for the means of suppressing, those riots or disturbances. If all this is not so, your marshal may go with a file of marines to execute a summons—the United States

military may be used for almost any peaceable purpose in the walks of life. When this military was called out there was no justifiable cause, there was absolutely none. It is necessary that it should be shown in this case that there was a lawful necessity existing at the time before calling out the military. As to the point raised in the second instruction, Mr. Scott asked whose duty it was to open the polls and conduct the elections? He apprehended it would be found that the duty was conferred upon those commissioners who were judges of the election; that to their honor, integrity and discretion the law confided the faithful conduct of that election; that they were the judges of the manner and the time for receiving votes, with no appeal from their decisions, which were such as the law provides, peaceably engaged in the performance of their duty; when peace and quiet prevailed around them, and the citizens engaged in the exercise of their rights, a portion of the United States military parades upon the ground, with loaded muskets and flashing bayonets, to participate in the business of election.

The district attorney exalts the mayor into an officer in command of a military force, to dictate to the judges; the proposition is confined to the simple fact of opening the polls, but he goes further, and says that he has the power to open the polls, and to proceed with the election; and it is but one step further to command how they shall proceed with the election, and to say, if the peace was disturbed, who disturbed it; if a riot occurred, who occasioned it; he apprehended, who occasioned it; the military. If the mayor, with his army in array, transcended his right, have the people not the right to express disapprobation; to resist his assumed dictation?

As to the second proposition of the district attorney, they asked the court in effect to say that these commissioners were guilty of a riot; he assumes as a fact what is a matter of proof, to be expressed at the termination of the trial. The mayor had a right, for a proper reason, and for sufficient cause, to call out the military; but in no case is this to be done in the absence of that cause, or the person to be marshal of this district. He closed by saying that he apprehended that he had pointed out in a lucid manner the reasons which the counsel for the defence had for refusing to accede to the extraordinary proposition of the district attorney.

Mr. Key proceeded to read to the court, from the charter, the laws governing the conduct of municipal elections.

Mr. Bradley proposed to offer law authorities in relation to the points contained in the proposition of the district attorney. He entered his protest against those propositions in a most emphatic manner; that no irresponsible discretion was vested in the mayor or any other civil officer, either by the laws

of this country or of England; he referred to the case, among others, of the British rioters, as reported in the Common Law Reports of England, in support of his position. Mr. Bradley went on to say that the first thing to be considered by the jury was: was it an unlawful assemblage? Was there a breach of the peace? If there was none, then the marines were unlawfully called out. It might be an unlawful assembly in a very slight degree, then there was no pretence for calling out the military. Such cases must depend upon their own circumstances. The jury was to judge, under the particular circumstances, whether the mayor used more violent means than were necessary to disperse the mob. He apprehended that it would not be determined that the discretion of the magistrates in this country went further than it did in England. If there is no law to justify the mayor in his course, then we are justified, and could to all intents and purposes, resist any unjustifiable and irresponsible exercise of such discretionary power.

Mr. Key replied, contending, in the course of his remarks, that the act of the mayor was just and legal; and that the act of the president in acceding to his application for the marines, fortified by an affidavit which was sworn to by a respectable citizen of Washington, and granting him discretionary power to use them according to the exigencies of the case, was a proof of the confidence reposed in him by the president, to do and act as the danger and peril of the citizens thus disturbed might in the case seem to warrant. He said that it was contended by the other side, that the riot had ceased when the mayor first went to the polls; what did the mayor find to be the case when he arrived there? He found the barricades broken and the polls closed. All was quiet, said the counsel for the defence, but it was the quiet that prevails on the battle-field after the fight is over, and no victim is left to make resistance. Was it not manifestly the mayor's duty, under these circumstances, to employ such force as had been placed in his hands and at his command? He did employ that force, and legally too; he used those means for the maintenance of the public peace and good order in the community, which peace has been flagrantly violated. Was it not remarkable that the judges of election had taken the unwarrantable responsibility of closing the polls in violation of all law, at a time when, according to the testimony which had been given on the part of the defence, all was quiet, and the voting was proceeding peaceably? And upon what plea, then, did they do this? It was upon the vapory excuse springing out of a sickly and absurd sentimentality that they would not receive votes with the flashing bayonets of the marines directed towards their breasts. What right had they to refuse compliance with the express provisions of

the law, when all was peace and quietness around them? The marines were a square off; they could not have been afraid of them at the time the polls were closed. He contended that the conduct of the judges ought to be held up to universal opprobrium, and they consigned to everlasting shame.

Mr. Key quoted from the act of congress of 1812, contained in [2 Stat. 721], to show "that the mayor shall see that the laws of the corporation shall be duly executed, and that he shall punish any disobedience of those laws on the part of its officers."

Mr. Key cited many other authorities to sustain the action of the mayor and in support of his instructions. He contended that the commissioners had violated the laws by closing the polls, and that it was but proper, under the existence of all these facts, to ask the court to instruct the jury that the marines were on the ground legally and for the exercise of a legal purpose.

Mr. Ellis said that Mr. Key had referred to the constitution of the United States to show the authority of the president to call out the marines and interfere in the case now before the court. The argument was that this portion of the constitution gave the president the power. He contended that it gave no such authority to the president. At the present time the president is not the United States—not quite. His power then is not here, but in the legislation of congress on the constitution. He quoted from the law to show in what cases the president may call out the military. He contended that there were but three cases in which the president may call out the military; they were only in case of an insurrection, an invasion, and when necessary to the sustaining of the law. He contended that the authorities cited by the district attorney were not applicable to the matter now pending, that the law did not authorize the mayor to do what the district attorney contended to authorize him to do.

P. B. Key, U. S. Dist. Atty.

R. E. Scott, Joseph H. Bradley, Vespasian Ellis, and Ratcliff & Carrington, for the prisoners.

CRAWFORD, J., gave his answer to the instructions as follows: With reference to the first instruction, the court said that much argument had been expended in relation to the president's power to order out the military. The 15th clause of the 8th section of the article of the constitution of the United States, which confers upon congress the power to provide for the calling forth of the militia to execute the laws of the United States, to suppress insurrection and repel invasion, has been referred to, as well as the act of February 28, 1795, in 1 Stat. 424; but the terms of the law itself show that it applies to the states, and to a different class of contingencies than the one that is alleged to exist in this case. The act of 1807 has also been cited, but the court

was of opinion that this provision in the constitution and the laws passed under it have no application to the inquiry submitted to the jury. There was another clause in the 2d section of article 2 of the constitution which makes the president commander-in-chief of the army and navy of the United States; and section 3 of the same article makes it his duty to take care that the laws be faithfully executed. It was under these two last named sections of the constitution that he apprehended the power to call out the military forces in aid of the civil authorities would be found. The 15th clause of section 8 of article 1 of the constitution, under the appropriate head of "What congress shall have power to do," bestows legislative power; and section 2 of article 2 imposes the presidential duty. The chief magistrate of the United States, acting for this district, possesses the power which was exercised in this instance, and being the head of the proper department, the act of the secretary of the navy was, to all intents and purposes, the act of the president. The authority, then, according to the evidence which the jury had heard, was a necessary application of the power granted by congress, and was properly and lawfully exercised by the executive upon this occasion. The president could not make himself personally cognizant of all the circumstances whenever he was called upon to act. The representations made to him were such as not only to justify but to require the executive of the United States to do all that he did do. The marines and the officers who commanded them were legally at the polls of the first precinct of the Fourth ward, for they were there in obedience to orders. The mayor had a legal right to be there also, in his official character as mayor, either to quell the riot or to see that the laws of the city were duly executed. Although the act of the executive in this case was authorized by law and required by duty, the mayor was using a discretionary power when he applied to the secretary of the navy for the assistance of the marines; for the simple fact that he, and he alone, as every other officer similarly situated, must decide when the proper time has arrived to make such an application, shows that it lies at his discretion. Still, an inferior officer must in the first instance resort to the civil power, and it may be material to know whether he had done so, but if the civil power is too weak to repress the riot, or if the riot or disturbance be so great and so dangerous that it must be apparent that an attempt to quell it by the civil officers must be absurd—that such an attempt must necessarily be unsuccessful, and would only be followed by the scoffing at and derision of those who should attempt it, and by an increased tumult—the court was of opinion that resort might be had to other means, without further recourse to the civil power.

If the jury believe from the evidence, that marines made the first attack upon the rioters, and whatever of violence and turbulent conduct and acts proceeded from the defendants, or from any others connected with them, were resorted to in resisting such attack, then it would be their duty to inquire whether the defendants were guilty of a riot at that particular time and hour of the day; for the disturbance of the morning was wholly unconnected with the marines in any shape, except so far as it was the ground upon which the military were brought out. But if they should believe from the evidence in the case that the marines, after their arrival at the polls, where they were then legally, without any offence or violence upon their part, were first assailed in a violent and turbulent manner, according to previous concert, whether remote or immediate, on the part of the defendants, or any of them, either with or without connection with others who are not now upon trial, for the purpose of driving off the marines in spite of their opposition, then the defendants or so many of them as thus assailed the marines would be guilty of a riot.

With regard to the second instruction asked by the district attorney, the court remarked that the conduct of the elections, in the city of Washington, is confided by law to these commissioners, to be appointed as the law prescribes. Their duties are expressly pointed out by the law, and among these it is specified that they shall keep the polls opened from 7 o'clock in the morning until 7 o'clock in the evening. The commissioners cannot lawfully close the polls between those hours, and nothing short of some overruling necessity which makes it impracticable for them to receive the votes offered, or to continue the election, will excuse the closing of the polls. If the jury believe from the evidence that the polls were closed in the first precinct of the Fourth ward, in the language of the prayer, for no other reason than the presence of the said marines, then the act of closing them was illegal.

The mayor of the city of Washington has no powers other than those which are given him by the acts of congress and the laws of the corporate authorities, passed in pursuance and by virtue of the powers conferred upon them by congress. Among the duties of the mayor it is enjoined upon him by the "Act further to amend the charter of the city of Washington," passed on the 4th of May, 1812 (section 3; 2 Stat. 723), is to see that the laws of the corporation be duly executed. That provision was not repealed as had been asserted here. The act of May 13, 1820, § 1 (3 Stat. 584), repeals only so much of the law of 1812 as is "inconsistent with the provisions" of said act of 1820; and the law of May 17, 1848, § 1 (9 Stat. 223), continues the act of 1820 in full force for 20 years, with the same repeal (section 17; 9 Stat. 230) of the acts in conflict with its own provisions.

As to the recited duty of the mayor, as had been asserted, the mayor had the au-

thority to request or demand that the polls should be opened, but he could not enforce that demand, for there are no specific powers conferred upon him for that purpose. If you believe from the evidence that he demanded of the commissioners to open the polls when closed, but did not take any further or other steps that such demand should be carried into effect, it is no more than his duty required. And lastly, if the jury believe from the evidence that the defendant, or any of them, with or without the conjunction of others named in the indictment, but numbering at least three persons, did, in a violent and turbulent manner, to the terror of the people, with a determination mutually to assist one another against any who should oppose their act together according to previous concert and arrangement, remote or immediate, for the purpose of thwarting the efforts of the mayor to have the polls opened, or to prevent those efforts from succeeding, or for the purpose of opposing his exertions to preserve the public peace and preventing their success, then the defendant, or so many of them as thus acted, would be guilty of a riot.

The jury came into court, and represented to the judge their inability to agree upon a verdict. The judge thereupon discharged them.